IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

OCONEE COUNTY SCHOOL DISTRICT,   *

    Plaintiff,             *

vs.                        *      CASE NO. 3:14-CV-72 (CDL)

A.B., *by and through* L.B.,   *

    Defendants.         *

_____

O R D E R

Defendant A.B. is a student with a disability covered by the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.*, as amended by the Individuals with Disabilities Education Improvement Act of 2004, Pub. L. No. 108-446, 118 Stat. 2647. A.B. suffers from potentially life-threatening seizures. He brought a Due Process Complaint against Plaintiff Oconee County School District because the School District refused to provide A.B. with an aide trained to administer his seizure medication on the bus to and from school. Georgia Office of State Administrative Hearings Administrative Law Judge Kimberly W. Schroer ruled in favor of A.B., finding that A.B. was entitled to an amended individualized education plan that provides for an aide trained to administer his seizure medication on the school bus. Final Decision 48-49, *A.B. v. Oconee Cnty. Sch. Dist.*, OSAH-DOE-SE-1417873-108-SCHROER, ECF

No. 1-1 [hereinafter ALJ Order].  The ALJ also found that A.B.'s mother, Defendant L.B., should be reimbursed the cost of driving A.B. to and from school until the School District provides the trained aide.  *Id.* at 48.  But because L.B. "share[d] the blame for derailing the cooperative [individualized education program] process," the ALJ only awarded L.B. fifty percent of her transportation costs.  *Id.*

The School District appeals the ALJ's final decision, arguing that the ALJ erred in finding that the School District (1) failed to provide A.B. with a free appropriate public education as required by the IDEA and (2) committed procedural violations of the IDEA that impeded L.B.'s right to participate in the decision-making process.  A.B. and L.B. ("the Family") urge the Court to affirm the ALJ's final decision.

For the reasons set forth below, the Court finds that the ALJ's decision should be AFFIRMED.  The Court therefore grants the Family's motion for judgment on the record (ECF No. 29) and denies the School District's motion for judgment on the record (ECF No. 27).

## STANDARD OF REVIEW

Under the IDEA, the Court must "receive the records of the administrative proceedings," hear additional evidence if a party requests it, and base "its decision on the preponderance of the evidence."  20 U.S.C. § 1415(i)(2)(C).  "After reviewing all the

evidence, the District Court may grant relief without a trial by issuing what [the Eleventh Circuit has] called a judgment on the record." *R.L. v. Miami-Dade Cnty. Sch. Bd.*, 757 F.3d 1173, 1178 (11th Cir. 2014) (internal quotation marks omitted).

Determining whether an educational program provides free appropriate public education as required by the IDEA "is a mixed question of law and fact." *Draper v. Atlanta Indep. Sch. Sys.*, 518 F.3d 1275, 1284 (11th Cir. 2008). Questions of law involving "the interpretation of a federal statute" are subject to *de novo* review. *Id.* When reviewing the facts, the Court must give "due weight to the ALJ decision, and must be careful not to substitute its judgment for that of the state educational authorities." *R.L.*, 757 F.3d at 1178 (internal quotation marks omitted). The Court "is free to accept the ALJ's conclusions that are supported by the record and reject those that are not," and if the Court rejects the ALJ's conclusions, it must explain why. *Id.*

ALJ'S FINAL ORDER

## I.   Findings of Fact

After hearing seven days of testimony, the ALJ made the following findings of fact. The ALJ assessed the credibility of the witnesses before her, and the Court will not second-guess the ALJ's findings with regard to these witnesses. Neither the Family nor the School District pointed to errors in the ALJ's

3

findings of fact, and neither party asked that the Court hear additional evidence that is not in the administrative record.

A.B. has "profound physical and intellectual disabilities." ALJ Order 1 ¶ 1. He also suffers from chronic epileptic seizures. *Id.* at 3 ¶ 5. A.B.'s doctors, including neurologist Dr. Brannon Morris, prescribed A.B. anti-epilepsy drugs, but A.B. continues to have "breakthrough seizures" that typically last between one and three minutes. *Id.* at 3 ¶ 4.

A life-threatening condition called "status epilepticus" develops when a person seizes continuously for approximately thirty minutes. *Id.* at 4 ¶ 5. If a seizure lasts for more than five minutes, the seizure is not likely to stop on its own, so physicians commonly recommend emergency intervention to prevent the patient from progressing toward status epilepticus. *Id.* Drug treatment to prevent status epilepticus should begin "without delay" when a patient suffers a seizure that lasts more than five minutes because seizures become more difficult to control as they progress. *Id.*

During the timeframe relevant to this action, A.B. attended North Oconee High School.[1] Although A.B. has never had a seizure lasting more than five minutes at school or on the school bus, his seizures have increased in frequency and duration. *Id.* at

---

[1] A.B. no longer attends North Oconee. Sch. Dist.'s Br. in Supp. of Mot. for Summ. J. 2 n.2, ECF No. 27-1.

25 ¶ 38.   Dr. Morris prescribed A.B. an anti-seizure medicine
called Diastat for any seizure lasting more than five minutes.
*Id.* at 2 ¶ 2.   Diastat must be administered rectally; the person
administering Diastat must place the patient on his side, pull
down the patient's pants and underpants, hold the buttocks
apart, use the Diastat pre-loaded syringe to administer the
Diastat, and remove the syringe and hold the buttocks closed for
a count of three.   *Id.* at 5 ¶ 6.   A.B.'s 2012 Student Health
Action Plan provided for the administration of Diastat if A.B.
had a seizure at school that lasted more than five minutes.   *Id.*
at 6 ¶ 7.   A.B.'s teacher at North Oconee High School and other
personnel at the school, including the school nurse, were
trained to administer Diastat to A.B. at school.   *Id.*

    A.B. rode a special education school bus to and from school
and on community trips.   *Id.* at 12 ¶ 18.   During the relevant
timeframe, A.B. lived about six miles from North Oconee, and he
was the last student picked up in the morning and the first
student dropped off in the afternoon.   *Id.* at 12 ¶ 17.   The trip
time from A.B.'s house to North Oconee was between eight and
twelve minutes, and the School District presented evidence that,
barring extraordinary circumstances, A.B. is less than five
minutes from his home or school at any given point along the
route, although weather and traffic could impact the commute and
the response time for emergency medical personnel.   *Id.; accord*

*id.* at 18 ¶ 26 n.18.   Though a special education bus's aisle is wider than a typical school bus's aisle and there was some open floor space in an unused wheelchair slot on A.B.'s bus, the available unobstructed floor space was fairly small.  *Id.* at 13 ¶ 18.

A.B.'s Student Action Health Plan did not address treatment of a breakthrough seizure on the school bus, and the School District did not have a written policy regarding administration of Diastat on school buses.  *Id.* at 13 ¶ 19.   In the spring, summer, and fall of 2013, A.B.'s mother L.B. was at odds with School District personnel over A.B.'s individualized education program for the 2013-2014 school year, so A.B. did not have a new IEP at the beginning of the school year.  *Id.* at 6 ¶ 8 to 10 ¶ 14.  A.B.'s initial IEP meeting did not address transportation or A.B.'s seizure disorder.  *Id.* at 7 ¶ 9.   But in August, L.B. asked School District personnel what the School District's Diastat policy was.  *Id.* at 13 ¶ 19.   The School District did not have a written policy, and L.B. got conflicting responses from School District personnel.  *Id.*  A.B.'s teacher and the School District's transportation secretary said bus personnel would not administer Diastat, but the school nurse said that they would.[2]   *Id.* at 14 ¶ 20.   L.B. told the transportation

---

[2] That same school nurse stated in an email that she understood the policy to be that bus personnel would *not* give Diastat on the bus but

secretary that she would drive A.B. to and from school until the issue was resolved. *Id.*

Many of the School District's administrators were relatively new to the School District and had little institutional knowledge of the School District's unwritten policies. *Id.* They decided to investigate whether the School District had a procedure regarding Diastat administration on buses and, if so, what it was. *Id.* Several administrators, including the chief operations officer and the school nurse supervisor, decided to develop a written procedure regarding Diastat on the bus. *Id.*

Faye Warden, the school nurse at North Oconee, told School District administrators that she understood the School District's policy to be that bus personnel would *not* give Diastat on the bus but would call 911 instead. *Id.* at 14-15 ¶ 21. Warden also researched the School District's options for Diastat and determined that other nearby school districts had the same policy because of issues with space, safety, traffic, and privacy. *Id.* at 15 ¶ 21. Warden also noted that Children's Healthcare of Atlanta recommended against administering Diastat on a bus. *Id.* In a manual, Children's Healthcare states that "the use of Diastat is usually not appropriate during

would call 911 instead.  ALJ Order 15 ¶ 21; *accord* ALJ R. P-20 at AB000243, Email from Faye Warden to Suzanne Korngold (Aug. 14, 2013).

transportation on school buses." *Id.* at 16 ¶ 23. Instead, according to Children's Healthcare, the bus personnel should time the seizure and call 911 for assistance if the seizure lasts more than five minutes. *Id.* The Children's Healthcare manual does note that "individual and health needs vary," so each student's seizure action plan should be followed. *Id.* at 15 ¶ 23.

In August 2013, the School District's superintendent and his cabinet adopted a Diastat bus policy based on the recommendation of the School District's transportation director, who is also a trained emergency medical technician. *Id.* at 18 ¶ 26. Under that policy, if a student began to seize on the bus to or from school, the bus driver would determine the closest location—school or the student's home—and call 911 and request that an emergency medical technician meet the bus at that location. *Id.* Once there, the student would be taken off the bus, and a trained person (parent, teacher, or EMT) would administer Diastat. *Id.* In reaching its decision, the cabinet considered a number of factors, including the policies of other school districts and the Children's Healthcare manual. *Id.* The cabinet was, however, willing to consider an exception to the general procedure if a student presented additional information to justify an exception. *Id.* The ALJ noted that the School District never notified L.B. that someone trained to administer

Diastat would need to remain home for some period of time after A.B. left for school. *Id.* at 44 ¶ 24.

While the School District was considering its policy on the administration of Diastat on the bus, L.B. completed A.B.'s annual Student Health Action Plan in connection with A.B.'s seizure disorder. *Id.* at 16 ¶ 24. L.B. identified Dr. Morris as A.B.'s physician but declined to give the School District permission to contact Dr. Morris regarding A.B.'s seizure disorder or treatment. *Id.* The Student Health Action Plan stated that if A.B. had a seizure, the school staff should note the time and duration, ease A.B. to the floor, cushion his head, and turn him onto his side. *Id.* In the event of a seizure lasting more than five minutes, school personnel were to "administer Diastat 15 mg according to school procedure." *Id.*

The School District's special education director, Suzanne Korngold, emailed L.B. on September 10, 2013 to let her know that the superintendent and cabinet had decided to "keep the [School District's] policy of calling 911 when a student has a seizure on the bus." ALJ R. P-3 at AB000066, Email from Suzanne Korngold to L.B. (Sept. 10, 2013). Korngold asked L.B. to contact her if she needed further clarification. *Id.* L.B. responded with a request for more specifics, such as whether the bus would pull over and wait for emergency medical personnel or would drive quickly to the student's home or school. ALJ R. P-4

at AB000067, Email from L.B. to Suzanne Korngold (Sept. 11, 2013). After more back and forth via email, L.B. was dissatisfied with Korngold's responses, and she believed that Korngold was violating A.B.'s legal rights. ALJ Order 19 ¶ 28. Korngold thus suggested that L.B. meet with Korngold's supervisor, the School District's chief academic officer. *Id.* L.B. declined. *Id.*

During the same timeframe, A.B.'s teacher and North Oconee's principal were trying to get L.B. to attend an IEP meeting so they could finalize A.B.'s IEP for the 2013-2014 school year. *Id.* at 20 ¶ 29. L.B. ultimately agreed, as long as the Diastat issue would be discussed in the meeting and other conditions were met. *Id.* L.B. asked A.B.'s teacher to make sure that the School District's transportation director, who A.B.'s teacher said was the ultimate decision maker on the Diastat bus procedure, would be present at the IEP meeting. *Id.* at 20 ¶ 30. L.B. also asked A.B.'s teacher whether the procedure adopted by the cabinet applied to the community based instruction trips A.B.'s class took about three times a week, accompanied by their Diastat-trained teacher and a para-professional. *Id.* at 20-21 ¶ 30. A.B.'s teacher, however, wanted the IEP team to focus on reaching an agreement on amending the IEP, not on the Diastat issue. *Id.* at 21 ¶ 31.

She asked that the School District's transportation director not be invited to the IEP meeting, and he was not. *Id.*

In late October, the Family's attorney gave School District personnel a letter from Dr. Morris, A.B.'s neurologist. The short letter explained that Dr. Morris had prescribed Diastat for A.B. in the event of a prolonged seizure. ALJ R. P-27 at AB000284, Letter from Dr. Brannon Morris to Sch. Dist. (Oct. 29, 2013). Korngold emailed L.B. to acknowledge receipt of the letter. ALJ Order 21 ¶ 32. Korngold noted that Dr. Morris's letter did not mention transportation, and she referenced the Children's Healthcare recommendation against administering Diastat on a school bus. *Id.* Korngold told L.B. that the School District would consider A.B.'s individual needs regarding Diastat, but the School District needed more information from his doctor first. *Id.* In a letter to L.B.'s lawyer, the School District's attorney reiterated the request for more information and asked for a release to speak to Dr. Morris. *Id.* at 22 ¶ 33.

A.B.'s IEP team gathered for the IEP meeting on November 5, 2013. *Id.* at 22 ¶ 34. L.B. attended, along with two of A.B.'s doctors and his behavior specialist. *Id.* Dr. Morris did not attend. *Id.* Korngold and A.B.'s teacher attended on behalf of the School District. *Id.* Neither the School District's transportation director nor the school nurse attended. *Id.* A.B.'s primary care physician, Dr. Paul Haver, gave a brief talk

11

about the risks of A.B.'s seizure disorder. *Id.* at 22 ¶ 35.  He
also explained that he and Dr. Morris ordered Diastat for A.B.
and that their orders should be followed because of the risks to
A.B. of a prolonged seizure. *Id.* But Dr. Haver had to leave
the meeting after his five-minute presentation. *Id.* at 23 ¶ 35.
Dr. Haver offered to speak with School District personnel to
answer any additional questions, and he said that Dr. Morris
would be a good resource too. *Id.* L.B., however, refused to
allow School District personnel to speak with A.B.'s doctors;
L.B. required that all questions to the doctors and answers from
the doctors go through her. *Id.* Although L.B. stated that her
refusal was based on her concerns for A.B.'s privacy, the ALJ
found, based on the testimony and the record evidence, that
L.B.'s refusal to sign the release "arose primarily from a
desire to protect her own privacy interests and those of her
other family members, rather than A.B.'s." *Id.* at 23 ¶ 36 &
n.22.

       During the November 5 IEP meeting, Korngold told L.B. that
the School District's cabinet had made a final decision to
follow Children's Healthcare's recommendation and not administer
Diastat on buses. *Id.* at 25 ¶ 38.  Korngold stated that the
cabinet was willing to consider exceptions to the rule on a
case-by-case basis if the student's physician provided enough
information to justify the exception. *Id.* Korngold could not,

however, make an exception for A.B. without additional
information from Dr. Morris. *Id.* But Korngold also told L.B.
that the School District *would* make an exception and permit
A.B.'s teacher to administer Diastat on the bus during community
based instruction trips. *Id.* at 26 ¶ 39.

L.B. explained that A.B.'s seizures had increased in
frequency and duration. *Id.* at 25 ¶ 38. She also asked why the
plan for community based instruction trips could not be adopted
for A.B.'s bus rides to and from school, and she reminded School
District personnel that A.B.'s doctors offered free Diastat
training for A.B.'s bus monitors. *Id.* at 26 ¶ 40. Korngold did
not offer a clear explanation for the discrepancy. *Id.* at 26-27
¶ 40. The IEP team did not finalize A.B.'s IEP on November 5
because L.B. needed time to review it with her attorney, who was
not present. *Id.* at 27 ¶ 42.

L.B. filed a due process complaint on November 12, 2013.
She asked that the School District be required to authorize bus
personnel to administer Diastat. *Id.* at 27-28 ¶ 43. She also
asked that the School District reimburse her for driving A.B. to
and from school during the 2013-2014 school year. *Id.* at 28
¶ 43.

After L.B. filed her due process complaint, the parties
continued to try to work out the Diastat issue. Dr. Morris sent
two more letters to the School District. In the first letter,

13

Dr. Morris explained why he did not think the Children's Healthcare recommendations should apply to A.B., why he believed Diastat administration was safe on A.B.'s special education bus, and why traffic safety issues did not militate against administration of Diastat on the bus. ALJ R. P-29, Letter from Dr. Brannon Morris to L.B. (Dec. 2, 2013). In his second letter, Dr. Morris addressed all of these issues and reiterated why it was his medical recommendation that A.B. be given Diastat on the bus in the event of a prolonged seizure. ALJ R. P-30, Letter from Dr. Brannon Morris to L.B. (undated). He also explained why he did not recommend an alternative drug, which had not yet been approved by the U.S. Food and Drug Administration for treatment of prolonged seizures, for A.B. *Id.* at AB000294.

## II. Conclusions of Law

The ALJ made the following conclusions of law. The IDEA requires states that receive federal funding to make a "free appropriate public education" available to all resident children with disabilities. ALJ Order 29 ¶ 3; *accord* 20 U.S.C. §§ 1400(d)(1)(A), 1412(a)(1)(A). School districts must also provide related services, like transportation and school health services, that are required to help children with disabilities receive a free appropriate public education, or FAPE. *Id.; accord* 20 U.S.C. § 1401(26)(A).

14

The ALJ found that the School District committed procedural and substantive violations of the IDEA.[3]  With regard to the procedural violation, the IDEA "establishes a comprehensive system of procedural safeguards designed to ensure parental participation in decisions concerning the education of their disabled children." *Honig v. Doe*, 484 U.S. 305, 308 (1988); *accord* ALJ Order 30 ¶ 6.  To prove a denial of FAPE based on a procedural violation, the Family must show that the procedural violation "'significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the parent's child.'"  ALJ Order 30 ¶ 6 (quoting 34 C.F.R. § 300.513(a)(2)(ii)).

The ALJ found that the School District committed a procedural violation of the IDEA when it failed to send a representative to the November 5 IEP meeting "with either the authority to commit the School District to train its bus personnel to administer Diastat on the bus for A.B., or the knowledge of the School District's transportation resources, health services, or emergency response capabilities such that the IEP team could make an informed, collaborative decision regarding whether A.B.'s unique needs required an exception to the School District's general procedures on administration of

---

[3] The ALJ also concluded that several of the School District's actions did not violate the IDEA.  The Family does not appear to dispute those rulings, so the Court need not address them here.

Diastat on the school bus." *Id.* at 39 ¶ 18; *accord id.* at 35 ¶ 13 to 40 ¶ 20.

The ALJ also found that the School District committed substantive violation of the IDEA. The ALJ noted that an IEP must include related services, including transportation and school health services, that are required to help a disabled child receive FAPE. *Id.* at 41 ¶ 21; *accord Irving Indep. Sch. Dist. v. Tatro*, 468 U.S. 883, 890-91 & 887 n.2 (1984). The ALJ found that administration of Diastat in the event of a prolonged seizure was necessary to enable A.B. to receive FAPE and that the School District's refusal to make an exception to its general procedure for A.B. denied A.B. services that were necessary for him to receive FAPE. ALJ Order 42 ¶ 22 to 45 ¶ 24. Specifically, the ALJ concluded that the School District knew by the time of the November 5 IEP meeting that (1) A.B.'s seizures were increasing in frequency and duration, (2) the School District could not guarantee that A.B. would receive timely Diastat treatment under its general plan, (3) Dr. Haver and Dr. Morris prescribed Diastat for A.B. in the event of a prolonged seizure, and (4) Dr. Haver believed that there was an unacceptable risk associated with failing to treat a prolonged seizure promptly. *Id.* at 44 ¶ 24. The ALJ also noted that there was no evidence that the School District had any medical information to support delaying the administration of Diastat.

16

*Id.*  For all these reasons, the ALJ concluded "that the School District's insistence on maintaining its general procedure denied A.B. supportive services that were necessary for him to receive FAPE." *Id.* at 44-45 ¶ 24.

As a remedy for both the procedural and substantive violations, the ALJ ordered that the School District reimburse L.B. for her driving expenses from November 5 until the School District provides a Diastat-trained aide for A.B.'s daily bus ride. *Id.* at 48 ¶ 30.  But the ALJ also found that "both parties acted unreasonably and share the blame for derailing the cooperative IEP process" and that L.B. should only receive fifty percent of her driving expenses because she denied the School District access to Dr. Morris. *Id.*  The ALJ further ordered that A.B.'s IEP be amended to provide for a Diastat-trained aide on the bus. *Id.* at 48 ¶ 31.  The ALJ also ordered that unless L.B. signed a release allowing the School District to talk directly with Dr. Morris, the School District could maintain its procedure of calling 911 and attempting to reach school or home within five minutes, *but* the bus aide must be prepared to administer Diastat on the bus if the bus cannot reach either location within five minutes. *Id.* at 49 ¶ 31.

## DISCUSSION

The School District does not quarrel with the ALJ's general conclusion that a parent of a disabled child must have a

meaningful "opportunity to participate in the decision-making process regarding the provision of a FAPE to the parent's child." 34 C.F.R. § 300.513(a)(2)(ii). The School District also does not dispute that an IEP must include related services, including transportation and school health services, that are required to help a disabled child receive FAPE. *Tatro*, 468 U.S. at 890-91 & 887 n.2. Rather, the School District argues that the ALJ did not correctly apply the law to the facts in this case.

First, the School District argues that the ALJ's order is internally inconsistent because the ALJ found that the School District denied A.B. FAPE but then ordered that the School District was not required to alter its procedure unless L.B. permitted School District personnel to speak with Dr. Morris. In other words, according to the School District, a fair reading of the ALJ's Order supports the conclusion that the School District actually did not fail to provide FAPE because the School District was entitled to more medical information before authorizing an exception to the Diastat procedure for A.B. The School District did not read the ALJ's Order closely enough.

The ALJ found a denial of FAPE because the School District's plan created a risk that A.B. would not receive Diastat as soon as possible after his seizure reached the critical five-minute mark. The ALJ noted that the School

18

District did *not* need additional medical information to authorize administration of Diastat on the bus during community based instruction trips.  One of the reasons the School District authorized the administration of Diastat on the bus during community based instruction trips is that the bus would not always be less than five minutes away from A.B.'s home or school.

Based on these facts, combined with the School District's knowledge that (1) A.B.'s seizures were increasing in frequency and duration, (2) the School District could not guarantee that A.B. would receive timely Diastat treatment under its general plan, (3) Dr. Haver and Dr. Morris prescribed Diastat for A.B. in the event of a prolonged seizure, and (4) Dr. Haver believed that there was an unacceptable risk associated with failing to treat a prolonged seizure promptly, the ALJ reasonably concluded that the School District did not need any additional medical information to determine that a trained aide should be provided on A.B.'s daily bus ride to administer Diastat in the event that A.B.'s bus could not reach home or school within five minutes after A.B. began seizing.  The record also supported a finding that failure to administer Diastat to A.B. as soon as practicable after the five-minute mark subjected A.B. to a risk of life-threatening injuries.  For these reasons, the Court finds no error in the ALJ's conclusion that A.B.'s IEP denied

him FAPE because it did not include adequate health services on
the bus.

The ALJ's prospective remedy is not inconsistent with the
ALJ's conclusions of law.  Her remedy requires a trained aide to
be on the bus ready to administer Diastat if the bus does not
reach A.B.'s home or school within five minutes after a seizure
begins.  It also permits the School District to maintain its
procedure of attempting to get A.B. home or to school within
five minutes for Diastat treatment absent some information from
A.B.'s doctors justifying a different course (like immediately
stopping the bus, calling for 911, and administering Diastat).
The remedy balances the School District's interest in obtaining
more information from A.B.'s doctors with A.B.'s interest in
receiving Diastat as soon as possible after his seizure reaches
five minutes.  If L.B. wants A.B. to receive Diastat without
having the bus try to reach home or school first, then she has
to sign a release, and A.B.'s doctors have to explain why the
School District should make an exception to its plan.  But if
the bus cannot reach home or school within five minutes, then
A.B. is not subjected to an unreasonable risk of delayed Diastat
administration because someone trained to administer Diastat
will be with him on the bus.  The Court finds no error.

The School District also appears to argue that the ALJ
should have concluded that L.B. waived A.B.'s right to

transportation services by refusing to allow School District personnel to speak with Dr. Morris.  The School District points out that the ALJ cited a case which noted that a parent "is free to decline special education under IDEA rather than submit [her child] to [a] medical evaluation."  *Shelby S. ex rel. Kathleen T. v. Conroe Indep. Sch. Dist.*, 454 F.3d 450, 455 (5th Cir. 2006); *accord G.J. ex rel. E.J. v. Muscogee Cnty. Sch. Dist.*, 704 F. Supp. 2d 1299, 1309-10 (M.D. Ga. 2010).  In those cases, the courts ordered a reevaluation of a student in accordance with the IDEA's triennial reevaluation requirement.  *See G.J.*, 704 F. Supp. 2d at 1310.  The courts noted that the parents could either submit to the reevaluation or decline services under the IDEA.  *Id.; Shelby S.*, 454 F.3d at 455.

Here, the ALJ did not find that L.B. had waived anything, and the record does not support such a finding.  L.B. did not reject transportation services.  Rather, she rejected transportation services that carried a risk of delayed Diastat administration, and she sought an amendment to A.B.'s IEP to fix the problem.  The ALJ gave L.B. a choice: (a) sign a release allowing School District Personnel to speak with Dr. Morris or (b) the School District can maintain its procedure of attempting to get A.B. home or to school within five minutes for Diastat treatment (subject to the ALJ's trained bus aide condition).  The Court finds no error.

Finally, the School District contends that any failings in the IEP process or the IEP itself are due to L.B.'s conduct, not the School District's. The School District contends that L.B. frustrated the collaborative goals of the IDEA by refusing to authorize School District personnel to speak with A.B.'s doctors about A.B.'s need for Diastat on the bus. But the ALJ, after hearing seven days of testimony, found that L.B. did not shoulder the entire blame for derailing the collaborative process. Rather, the ALJ found that both parties were at fault. The Court finds no error in this factual determination.

In summary, the ALJ was authorized to conclude based on the evidence before her that A.B.'s IEP denied him FAPE because it did not include adequate health services on the bus. Based on that denial of FAPE, the ALJ was justified in ordering both prospective relief in the form of an amended Diastat procedure and reimbursement of half of L.B.'s transportation costs.[4] *See, e.g., Draper*, 518 F.3d at 1285 (noting that both a prospective injunction regarding a student's placement and reimbursement for expenses of private school are allowed under the IDEA if the public school denied the student FAPE).

---

[4] The Family previously claimed that the ALJ erred in reducing the amount of L.B.'s reimbursement. The Family has apparently abandoned that claim.

CONCLUSION

As discussed above, the ALJ's decision is AFFIRMED.  The Court therefore grants the Family's motion for judgment on the record (ECF No. 29) and denies the School District's motion for judgment on the record (ECF No. 27).[5]


IT IS SO ORDERED, this 1st day of July, 2015.

S/Clay D. Land
CLAY D. LAND
CHIEF U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA

---

[5] In addition to its request that the Court affirm the ALJ's decision, the Family asks that the School District be "restrict[ed] from continued hostility toward the Family."  Family Mot. for Summ. J. 3, ECF No. 29.  It is not clear what relief the family is seeking here. The Family did not ask the Court to review evidence outside the administrative record, and the Family noted that "the hostility has abated with the new year, a new school and new counsel for [the School District]."  Family Br. in Supp. of Mot. for Summ. J. 18, ECF No. 29-1.  To the extent the Family is seeking entry of an injunction restricting "hostility," that request is denied.  The Court nonetheless encourages L.B. and the School District to continue working together in a civil manner in the best interests of A.B.